STATE *ex rel.* FREDERICK SCOTTEN *et al. vs.* HASCAL R. BRILL,
District Judge.

Argued June 21, 1894.   Reversed July 10, 1894.

No. 8925.

Constitutional law.

The St. Paul park act (Sp. Laws 1891, ch. 35) *held* constitutional.

Certification of copy of resolutions.

A written communication from the board of park commissioners, signed
by their secretary, and addressed to the board of public works, stating
that the former board had passed certain resolutions and orders, copies
of which are set out, is a sufficient "certification," under the seventeenth
section of the act.

Facts stated and held to be an arbitrary and illegal assessment.

A proposed park having been established on the southerly point of Day-
ton's bluff, the "assessment district" to be assessed for benefits extended
from the park north about a mile and a quarter. The board of public
works divided this district into several sections or subdistricts, divided
from each other by east and west lines,—each subdistrict being about one-
half mile wide from north to south,—and assessed every lot within a par-
ticular subdistrict the same amount, regardless of their relative distances
from the park. *Held* that, in thus apportioning the benefits to the re-
spective lots, the board adopted an arbitrary and illegal rule.

Certiorari issued out of this court on the relation of Frederick
Scotten and twenty two others to *Hascal R. Brill,* one of the judges
of the District Court of Ramsey County, requiring him to certify
and return to this court the record, files and proceedings remaining
in that court before him in the proceedings to establish Indian
Mound Park in the City of St. Paul and assess the benefits arising
therefrom in part upon adjacent real estate.

*S. L. Pierce* and *Edward G. Rogers,* for relators.

In making the assessment the district was divided into three sub-
districts.   Assessment was based on the location of the lots exclu-
sively.   There were pieces of unplatted land.   In assessing these
the board took into consideration how the piece of property would
cut up, what town lots it would make, and put a value on each pro-
posed lot estimating six lots to the acre.   There is a lake in the

assessment district owned by one of the relators. This was assessed as lots. It made no difference whether it was hill or hollow, farm land or swamp, the same benefit was assessed. *State ex rel. v. Judges of District Court,* 51 Minn. 539; *State ex rel. v. District Court,* 33 Minn. 295; *People ex rel. v. Mayor,* 63 N. Y. 291; *State ex rel. v. District Court,* 47 Minn. 406.

*Leon T. Chamberlain,* city attorney, and *Walter L. Chapin,* for respondent.

The board knew the character and topography of the land assessed. They considered the property and the size and number of the lots which could be carved out of unplatted property as one of the elements bearing on the benefits assessed. They did not labor under any mistake of fact. They exercised their best judgment. A large park specially benefits a large area of contiguous territory. The special benefits do not depend so much on the topography of the land as on proximity to the park, and, the assessments being comparatively small, it would not be practicable or reasonable to vary the amounts according to the height or depth of the property above or below the street grades. The judgment of the board must stand unless impeached for fraud or mistake of fact, as has been held many times by this court under the St. Paul Charter. *Rogers v. City of St. Paul,* 22 Minn. 494; *Carpenter v. City of St. Paul,* 23 Minn. 232; *State ex rel. v. Board of Public Works,* 27 Minn. 442; *State ex rel. v. District Court,* 29 Minn. 62; *State ex rel. v. District Court,* 33 Minn. 164; *State ex rel. v. District Court,* 33 Minn. 295; *State ex rel. v. District Court,* 47 Minn. 406.

MITCHELL, J. Certiorari to review the judgment of the District Court confirming assessments against relators' property for benefits from a proposed improvement, called "Indian Mound Park," on Dayton's bluff, in St. Paul. The relators assail the validity of the park act (Sp. Laws 1891, ch. 35) on the following grounds:

*First,* that it makes no adequate provision for the payment of compensation for land taken;

*Second,* it authorizes local assessments for improvements which are not certain to be made;

*Third*, it requires that there be added to the damages for land taken an amount sufficient to provide for interest probable to accrue before the assessments can be collected;

*Fourth*, it authorizes unequal taxation.

The first and second objections are practically the same, the latter being a mere corollary from the former. *In Re Lincoln Park*, 44 Minn. 299, (46 N. W. 355,) the former park act was held invalid on this ground; that is, because the park fund, which was the only source from which land taken was to be paid for, was limited in amount, and might be inadequate to meet the demands upon it. The present act is not obnoxious to this objection.

At the outset, there is a park fund derived from the sale of city bonds. . After designating the lands to be acquired for a particular park, the park board are required to determine how much of the cost, not exceeding 40 per cent., shall be paid out of this fund, "*as the same then exists*," and at the same time to appropriate and set apart such amount from the moneys "*then in the park fund*" towards payment of any damages awarded in such condemnation proceedings, which "shall be applicable to no other purpose whatever." They are then required to order the board of public works to proceed and ascertain the amount of damages or compensation to be paid for taking the land, and to assess the amount of such damages and expenses, less the amount appropriated out of the park fund, on the property specially benefited. Adequate means are provided for making and collecting these assessments with all reasonable speed. The assessments, when collected, are to be applied only to pay for the park for which they were made. If the assessments are not paid, provision is made for selling the land assessed. In case there are no purchasers, the land is struck off in the name of the city. If the city is unable to sell the certificates of sale within thirty days, it is required *forthwith* to issue certificates of indebtedness for the amount of the certificates of sale held by it. These certificates of indebtedness are the absolute obligations of the city.

The owners of the property taken are allowed interest on the damages awarded from the date of the award until thirty days after publication of notice that there is sufficient money in the treasury ready to pay them. This notice the city treasurer is required to give as soon as there is sufficient money in the treasury with which

to pay the damages awarded, and not until then is the city authorized to enter and take possession of the property. It would be difficult to contrive any system, short of requiring all the money to be in the city treasury in advance of initiation of any proceedings, that would more fully secure payment of compensation to those whose property is taken. Whatever uncertainty there is about it is only such as is necessarily incident to all human transactions. The relators, however, claim that the proviso to Sp. Laws 1891, ch. 35, § 37, p. 266, (St. Paul Municipal Code 1893, § 441), limiting city indebtedness exclusive of such as then existed, for park purposes, to $500,000, introduces an element of uncertainty as to the payment of compensation. If this argument is sound, we do not see why, on the same ground, every act authorizing the exercise of eminent domain by any municipal corporation would not be invalid, wherever there is a limitation upon the amount of indebtedness which it may contract. But, whatever else this *proviso* may mean, it is certain that it cannot affect the validity of any proceedings to acquire land for park purposes until the city indebtedness for such purposes reaches the limit. If, after the limit is reached, the park board is deprived of power to initiate proceedings for any new park, such want of power can be invoked in that particular instance. It has nothing to do with the constitutionality of the law, or with the power of the board to proceed while keeping within the limit.

There is nothing in the objection to the provision in the act for including in the assessment of benefits an amount sufficient to provide for interest on the damages awarded until the assessment can probably be collected in the due course of the proceedings. Such interest is a legitimate part of the damages to be allowed, and consequently a necessary part of the expense of the improvement. In no event can the assessment exceed the benefits from the improvement.

The objection that the act authorizes unequal taxation is based on the assumption that the legislature cannot provide for the payment of the cost of one local improvement partly by general taxation and partly by local assessments, unless they provide for the payment of every other local improvement from the same sources in the same proportion, while, under this act, a taxpayer who has contributed, by way of general taxes, towards paying forty per cent. of

the cost of one park, may be required to contribute, by way of special assessments, towards paying more than sixty per cent. of the cost of some other park.

The statement of this proposition would seem to be a sufficient demonstration of its unsoundness. What part of the cost of a local improvement shall be defrayed by general taxation, and what part by special assessments, is wholly a matter of legislative discretion, provided that the latter does not exceed the special benefits. All that the relators have a right to insist on is that there shall be no double or unequal taxation for this improvement.

2. There is nothing in the point that the resolutions and order of the board of park commissioners were not "certified" and transmitted to the board of public works as required by Sp. Laws 1891, ch. 35, § 17, p. 259 (Municipal Code 1893, § 421). These resolutions and order were transmitted to the board of public works in a written communication addressed to them, signed by the secretary of the park board; setting out copies of the resolutions and order, and stating that they had been passed by the park board, and specially calling the attention of the board of public works to them. This was sufficient. "To certify" means to testify to a thing in writing, and the statute does not prescribe any particular form of certification.

3. Neither is there any merit in the objection that the board of public works adopted a wrong basis of valuing the lands taken for the park. The president of the board was examined at great length as to the mental process by which he arrived at the basis of valuation. Conceding, without deciding, that the appraisement of the board can be impeached in this manner, and that this objection is open to the relators, still there was nothing elicited in the evidence to show that the board did not adopt the correct basis of value, viz. what the property would have sold for, as between one who wanted to buy and one who wanted to sell, as distinguished from a compulsory or forced sale, particularly in a time of special stringency in the money market.

4. Another objection is that it appears that the board of public works, in apportioning the benefits to the respective tracts benefited, adopted and acted on an illegal and arbitrary rule.

This objection is, in our opinion, well taken. The proposed park

was to consist of a tract of about seventeen acres on the extreme southerly point of Dayton's bluff, about one-third of the tract descending over the face of the bluff. The assessment district was entirely to the north of the park, so that the park would be on the southerly boundary of the district, and about midway between its east and west lines.

The assessment district extended about a mile and a quarter, in a direct line, north of the north line of the park, so that some of the lands assessed would be a mile and a quarter distant from it. The board divided this large area into three or four subdistricts, separated by imaginary lines running east and west. The first subdistrict consisted of all lands south of and facing on Burns avenue, which, as we understand the evidence, included all the property facing on, or in the immediate vicinity of, the park. The lots within this subdistrict were assessed all the way from one to six hundred dollars a lot, according to the size and formation of the property. The next subdistrict consisted of all the property between Burns avenue and an imaginary east and west line a half mile north of Burns avenue. The property in this subdistrict was assessed on the uniform basis of $7.20 for each 40-foot lot, which was taken as a unit of area. The next subdistrict consisted of all the property between the north line of the last subdistrict and another imaginary east and west line still half a mile further north. All the property in this subdistrict was assessed on the uniform basis of $3.60 for a 40-foot lot. Some property situated east and northeast of this was assessed on the basis of $2.50 per lot. There were several unplatted acre tracts in these subdistricts, and the board estimated how many forty-foot lots these would make, and then assessed them $7.20, $3.60, or $2.50 per 40-foot lot, according to the subdistrict in which the property was situated.

It is somewhat difficult to discover on what basis the board proceeded in fixing the limits of the assessment district, unless it was to include property enough to pay for the cost of the park, for it is hard to conceive that property situated a mile and a half from a park of this kind would derive any special benefit from it. But as the distinction between general and special benefits is somewhat indefinite, and it is often difficult to determine where the one ends, and the other begins, and as much must be left to the judgment of

the board, and as one of the witnesses said "they must stop some-where," we would not feel warranted in disturbing the action of the board in fixing the limits of the assessment district. But it is clear to us that they adopted an arbitrary basis in apportioning the benefits among the respective tracts included within the district. Aside from the peculiar benefits accruing to property fronting on or so near the park as to furnish a view of it, the principal benefits derived from a park result from access to it as a place of resort for recreation or amusement; and it is self-evident that these benefits are, in a great degree, in proportion to the proximity of the property to the park,—the benefit diminishing as the distance increases. Now, the law does not require absolute equality in taxation, but only equality as near as practicable. Hence, it is not required that the board, in making these assessments, should graduate them uniformly, in exact proportion to distance, as the atmosphere gradually shades off into space. This is altogether impracticable. But they must make the assessment uniform in proportion to benefits, as near as reasonably practicable. This they did not do in this case. It is perfectly evident that, to save labor, they adopted an arbitrary and inflexible basis of assessment in each of these subdistricts; assessing every lot in it exactly the same amount, in utter disregard of its distance from the park. Take for example the first subdistrict north of Burns avenue, which was half a mile wide from north to south,—how long from east to west does not clearly appear. A lot on the extreme south side of this subdistrict was assessed $7.20, —exactly the same as a lot on the extreme north side,—although the latter was half a mile further from the park than the former. The same is true of the next subdistrict, and so on. Moreover, two lots lying side by side and consequently practically equally distant from the park, if divided by an imaginary line between two subdistricts, would be assessed, one $7.20, and the other $3.60, or one $3.60, and the other $2.50, as the case might be. And again, so far as we can see, a lot at the extreme east or west end of a subdistrict would be assessed more than a lot in the south and central part of the subdistrict next north, although the latter lot might be much nearer the park than the former. These special assessments for local improvements are drastic enough, at best, and such an arbitrary system of apportioning them cannot be sustained.

It has been stipulated by the parties that, before the issuing of the writ of certiorari, a number of tracts included in relators' objections to the assessments had been sold on the judgment, and purchased by third parties, who had paid into the city treasury the full amount of the judgment, and received certificates of sale for the property. The relators are, notwithstanding this, entitled to a reversal of the judgment as to such tracts, but such reversal will not affect the titles of the purchasers; the judgment being erroneous, and not void. The recourse of the relators will be against the city, which has received the proceeds of the judgment.

Judgment reversed.

Buck, J., absent, sick, took no part.

(Opinion published 59 N. W. 989.)

58 . 159
85    33

